UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>PATRICK DEAL<br>Defendant. | Criminal No. 04-10185-GAO |

## SENTENCING MEMORANDUM OF
## DEFENDANT PATRICK DEAL

Defendant Patrick Deal ("Mr. Deal") hereby submits this sentencing memorandum to assist the Court in issuing a just sentence in this case.

### I. BACKGROUND

**A.   Preliminary Statement**

Mr. Deal has pled guilty to a one count Information charging him with conspiracy to deal in counterfeit obligations of the United States, in violation of 18 U.S.C. § 371.[1] The Presentence Report in this matter ("PSR"), to which the government has not objected, assigns Mr. Deal an adjusted offense level of 14 and puts him in Criminal History Category I under the United States Sentencing Guidelines ("U.S.S.G." or "Guidelines"). The government has indicated that it will move to reduce Mr. Deal's sentence by three months pursuant to U.S.S.G. § 5K1.1 in light of his substantial assistance to the government, thus putting him in a Guidelines sentencing range of 12-15 months imprisonment.

---

[1] The substantive offense for dealing in counterfeit obligations of the United States is found at 18 U.S.C. § 473.

For the reasons set forth in this Memorandum and in Mr. Deal's Objections to the PSR, Mr. Deal requests that this Court sentence him to a 9-month period of probation, consistent with a U.S.S.G. offense level of 10.[2] This sentence is appropriate under the U.S.S.G. given: (i) Mr. Deal's minimal role in the charged offense (U.S.S.G §3B1.2); (ii) the degree of Mr. Deal's substantial assistance, which deserves a reduction far greater than the three month (or 1-level) reduction the government recommends, (U.S.S.G. § 5K1.1); and/or (iii) considering a combination of factors that together warrant a departure under U.S.S.G §5K2.0.

As discussed in more detail below, a sentence of 9 months probation would be an appropriate, just and reasonable sentence whether it is viewed as a sentence imposed solely under the Guidelines or a sentence following all the factors set forth in 18 U.S.C. § 3553(a), as now mandated by the Supreme Court in *United States v. Booker*, 125 S.Ct. 738 (2005).

### B. Mr. Deal's Personal History and Characteristics

Mr. Deal has led a difficult life. As detailed in the PSR, his childhood was marked by violence, molestation, frequent moves, unsuccessful relationships and a relative lack of education. His difficult life experiences have created a depressed man with many challenges who has nonetheless sought to create the type of stable life for himself and his family that he never had.

As a child, Mr. Deal lived in fear as he, his sister and mother were frequently the targets of physical and psychological abuse at the hands of his biological father. (PSR ¶ 45) As early as age six, Mr. Deal observed and often broke-up violent exchanges

---

[2] The PSR amply establishes Mr. Deal's inability to pay a fine. (*See* PSR ¶ 74-78) Accordingly, Mr. Deal requests that, pursuant to U.S.S.G. § 5E1.2(e), the Court decline to impose any fine.

between his mother and father. (*Id.*) Although Mr. Deal's mother eventually moved him and his sister away from their abusive father, Mr. Deal was sexually abused by two different individuals in the family's new neighborhood. (PSR ¶ 46) Mr. Deal's family moved again, this time to Boston, Massachusetts. As with the family's previous moves, the move to Massachusetts did not provide Mr. Deal with stability, but again put Mr. Deal in an environment where he was the subject of physical and mental abuse at the hands of his mother's boyfriend. (PSR ¶ 47) Mr. Deal recalled observing an incident during this period when his mother was being beaten so severely by her boyfriend that Mr. Deal had to run to find his three uncles to intervene. (*Id.*) By the time Mr. Deal's family moved again, the frequent moves and violent surroundings had begun to take their inevitable toll on him. This was evidenced by, among other things, his performance in school where he was held back three times between 5th and 8th grade. (*See generally*, PSR ¶ 48) Mr. Deal's mother married again and moved the family to Baltimore, Maryland. Mr. Deal lived in Baltimore until his mother divorced and moved the Deal family back to Boston, Massachusetts. (PSR ¶ 49)

By the time Mr. Deal's family moved to Boston, he was old enough to move out on his own. As he matured into an adult, Mr. Deal sought to find more balance and stability in his life than he had had at a child, but, given his past, this proved difficult for him. Notwithstanding his difficult childhood, though, Mr. Deal was always a hard worker, continually working to support himself and members of his family financially. (*See generally* PSR ¶¶ 63-69) Around 1986, Mr. Deal met his first wife, Kerry Ann. (PSR ¶ 50) Although the union produced Mr. Deal's first daughter and instilled in Mr. Deal the drive to create a strong nuclear family with stable ties, the marriage did not

last long. Mr. Deal caught his wife in bed with another man, sending Mr. Deal into what appears to have been a state of untreated depression. (*Id.*) Things got better for a time for Mr. Deal when he met his second wife, Mandy Deal ("Mandy"). (PSR ¶ 51) The couple eventually married and gave birth to Mr. Deal's second daughter, Madison Deal ("Madison"). (*Id.*) Madison, unfortunately, had (and continues to have) health problems which began the day she was born. (*Id.*) Madison was born with her umbilical cord wrapped around her neck requiring her to be revived on several occasions. Madison also was born with a condition called cranial stynostoses, which required her to have a series of life threatening operations. (*Id.*) Madison still sees a developmental psychologist and a speech therapist. (*Id.*) Despite Madison's health problems and the mounting financial problems associated with their health care costs, Mr. Deal and Mandy persevered as a couple for a time, but eventually divorced. (*Id.*) Devastated by the divorce, and ruined financially, Mr. Deal returned to Boston, where he still has family members, to attempt to rebuild his life. (*See, id.*) It was in this context that he was drawn into the instant offense.

Despite Mr. Deal's untreated depression and limited financial resources, he continues to do what he can to support his two children – Devon, who is now 14 and Madison, who is 5. Mr. Deal's ex-wife, Mandy, confirms that Mr. Deal is a good father (*see* PSR ¶ 53), which is remarkable since Mr. Deal never had a positive father figure to emulate. Mr. Deal is active in his children's lives and provides voluntary financial support to both children despite his limited means. (PSR ¶ 52) He is particularly focused on ensuring that both of his children receive the education that he did not. Mr. Deal's role as a father figure has extended to others in his family – indeed, his niece, Crystal

4

Deal, credits Mr. Deal with motivating her to go to college and instilling in her a strong work ethic and good values. (*See* Ex. C hereto.)

In short, Mr. Deal's personal story is that of an individual doing his utmost to make the best of a difficult life. Although Mr. Deal has had a few bumps along the way, he is a good man with a good heart who "got involved in a bad situation at a time of intense personal and financial turmoil." (PSR ¶ 54) Numerous individuals have submitted letters on Mr. Deal's behalf to give the Court a clearer picture of Mr. Deal. (These letters are attached hereto as exhibits for the Court's convenience.) The following examples of statements drawn from these letters reveal that the actions of Mr. Deal that are the subject of the instant case were completely out of character for Mr. Deal.

> Patricia Herman, Mr. Deal's mother (attached as **Exhibit A**):
>> Patrick is a good kind person, he is a family man who loves his children. When his marriage broke up it took a lot out of him. He got involved [sic] was so out of character, and I can say without a doubt he will never do it again. All he wants now is to come home and start over again, and get back into the church and his family.
>
> Karen Goodwin, Mr. Deal's sister (attached as **Exhibit B**):
>> I have learned a lot of things in my life growing up with my brother he has taught me respect, honesty, and faith it was totally out of his character to do what he did.
>
> Crystal Deal, Mr. Deal's niece (attached as **Exhibit C**):
>> My uncle Pat use to tell me education was the key to life. He always gave me the advice I longed for from a father. Madison, Devon, and me were his girls . . . This was completely out of his character. His actions were completely unbelievable, and I believe that he would never do this again.
>
> Mandy Deal, Mr. Deal's former wife (attached as **Exhibit D**):
>> I have known Patrick for over ten years. In the years I have known him he has not ever been into any trouble . . . What Patrick has done was a complete shock to me. It is completely out of character for him. When the incident

5

> occurred Patrick and I had recently divorced. I know it was an extremely tough time for our entire family. Patrick seemed extremely depressed. To this day I still cannot believe Patrick did this. I pray Patrick does not get time in jail.

In addition, letters submitted by Mr. Deal's employers reveal that they have been impressed by Mr. Deal's character and strong work ethic:

> <u>Neil Lindenmayer</u>, Mr. Deal's supervisor (attached as **Exhibit E**):
>
> Beginning with the interview process, Patrick was up front and honest about his personal situation and it's [sic] potential outcome. It was with this sincerity [in mind] that the position was offered to him.... He is solid in his work ethic, punctual for work and available for working extra hours. He has been put in positions of responsibility and is a favorite with the customers.
>
> <u>Kevin DellArciprete</u>, Mr. Deal's employer (attached as **Exhibit F**):
>
> [A]fter a discussion of his past problems and ongoing situation I decided I would take a chance with Patrick since I felt every comment was sincere about rebuilding his life.
>
> After I reviewed Patrick Deal I felt that not only did I make a great decision not to judge a book by its cover I was amazed that he was settling in very comfortable [sic] and has become a key asset to my company. I strongly believe that all of his life's mistakes are in the past and his new outlook on life is inspiring to other he guides in our complex and diverse setting.

### C. The Nature And Circumstances of the Offense

When Mr. Deal's marriage to Mandy Deal crumbled, and he found himself depressed and nearly destitute, he learned of an opportunity to earn some money by bringing counterfeit currency back from Colombia, the conduct for which he now stands to be sentenced. As discussed in more detail in the PSR, Mr. Deal was involved in this conduct in a minimal way – as a courier -- for only a brief period of a few weeks, when he transported counterfeit currency twice for another individual.

As confirmed by the Probation Department's investigation as reflected in the PSR, Mr. Deal has generally conducted himself responsibly as a productive and law-

abiding citizen; these actions were out of character for Mr. Deal and he deeply regrets his involvement in this offense. Indeed, Mr. Deal has not only completely accepted responsibility for the offense, but, as discussed in more detail below, from the moment Mr. Deal was stopped by government officials, he has cooperated with the government completely, going so far as to put himself at great personal risk in order to help the government catch the ringleaders of this conspiracy.

### D. Mr. Deal's Post-Offense Rehabilitation

Since Mr. Deal was released on February 4, 2004, almost a year and a half ago, he has resumed work as a productive member of society. He has a stable job and strong ties to his family. He has complied with all conditions of his pretrial release and has demonstrated that indeed, this offense was out of character. He has continued to remain available to law enforcement and has repeatedly indicated his willingness to cooperate further if necessary. In sum, and as discussed more fully below, a prison sentence is unwarranted under either the Guidelines or the general sentencing mandates of 18 U.S.C. § 3553; accordingly, Mr. Deal's sentence should not include any prison time.

## II. ARGUMENT

### MR. DEAL SHOULD BE SENTENCED TO 9 MONTHS PROBATION, EQUIVALENT TO A SENTENCE FOR AN OFFENSE LEVEL OF 10

#### A. Post-*Booker* Sentencing Analysis

Under the Supreme Court's decision in *United States v. Booker*, sentencing courts must make a balanced inquiry into the facts of each case. *See Booker*, 125 S. Ct. at 757, 764, 766, 767, 768. Accordingly, a sentencing court must consider not only the once mandatory and now advisory guidelines range (18 U.S.C. § 3553(a)(4)(A)), but must also tailor the sentence in light of other statutory concerns, particularly those set forth in 18

7

U.S.C. § 3553. *See id.* at 757, 764; *see also Ferrara v. United States*, 2005 WL 1205758 at *3 (D. Mass. May 13, 2005) (Wolf, J.) (citing *Booker*). Section 3553(a) of 18 U.S.C. states that, in determining the precise sentence to be imposed, courts must endeavor to, "impose a sentence sufficient, but not greater than necessary, to fulfill the purposes set forth in [18 U.S.C. § 3553(a)(2).]" Section 3553(a)(2), in turn, states that such purposes are:

> (A)  to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
>
> (B)  to afford adequate deterrence to criminal conduct;
>
> (C)  to protect the public from further crimes of the defendant; and
>
> (D)  to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

In determining a minimally sufficient sentence, § 3553(a) allows sentencing courts to consider, *inter alia*, "the nature and circumstances of the offense and the history and characteristics of the defendant," (§ 3553(a)(1)), and "the kinds of sentences available" (§ 3553(a)(3)). Another statute relevant to a determination of the appropriate sentence is 18 U.S.C. § 3582, which requires a sentencing judge to "recogniz[e] that imprisonment is not an appropriate means of promoting correction and rehabilitation." In addition, 18 U.S.C. § 3661 states that "no limitation shall be placed on the information concerning the background, character, and conduct of [the defendant] which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence." In short, *Booker* and the governing sentencing statutes require an intelligent inquiry into all of the facts relevant to both the offense of conviction and to the defendant, including, but not limited to, analysis under the Guidelines.

8

B.   **Sentencing Guideline Calculations**

As noted above, the Court must calculate Mr. Deal's sentence under the Guidelines as part of its sentencing analysis. *See* 18 U.S.C. § 3553(a)(4)(A). Application of the Guidelines to the facts and circumstances of this case should place Mr. Deal in Offense Level 10, or a Guideline Sentencing Range of 6-12 months, a Zone B range rendering him eligible for the probationary sentence proposed herein. The degree of Mr. Deal's cooperation, in and of itself, should be enough to warrant a sentence in this range, as opposed to the Level 13 range proposed by the government. A Level 10 placement is also appropriate if the Court considers Mr. Deal's mitigating role in the offense, which should qualify him for a 4-level (or at least 2 to 3 level) reduction in offense level. Moreover, a combination of factors supports a departure under U.S.S.G. § 5K2.0.

1.   **The Extent Of Mr. Deal's Cooperation Alone Supports The Conclusion That Mr. Deal Should Be At Offense Level 10**

U.S.S.G. § 5K1.1 permits a downward departure where the defendant has "provided substantial assistance in the investigation or prosecution of another person who has committed an offense."[3] The substance of the assistance provided to the government is to be evaluated on a case-by-case basis. U.S.S.G. §5K1.1, cmt. 3. A departure is warranted when, *inter alia*: (i) the defendant offers timely assistance; (ii) the assistance provided puts the defendant in danger; and/or (iii) the assistance provided is truthful, reliable and complete. *See* U.S.S.G. §5K1.1 (2)-(5).

In this case, Mr. Deal was completely cooperative from the time of his initial contact with government officials, first with customs officials, then during a

---

[3] *U.S. v. Booker*, 125 S. Ct. 738 (2005) calls into question whether the government must even make a motion to depart in order for a court to reduce a defendant's sentence for substantial assistance. *See e.g.*, *U.S. v. Doe*, 398 F.3d 1254, 1260 (10th Cir. 2005).

9

comprehensive interview with Secret Service agents. After his initial interview, Mr. Deal immediately agreed to cooperate in an effort to apprehend the individual who had asked him to act as a courier ("Mr. X."),[4] and Mr. X's associates. Mr. Deal undertook this cooperation at what he perceived to be great personal risk to himself, as he believed Mr. X (and potentially others affiliated with Mr. X) to be a dangerous person.

First, Mr. Deal contacted Mr. X via monitored telephone call. The call was answered by an associate of Mr. X, "T", who, along with Mr. X, instructed Mr. Deal to travel to Malden, Massachusetts to complete the transaction. Mr. Deal continued to cooperate with authorities and agreed to travel to Malden. In the interim, Mr. Deal identified Mr. X for the Secret Service by photo identification. Mr. Deal then traveled to Malden escorted by agents and placed another call to Mr. X who instructed Mr. Deal to meet him at a Kentucky Fried Chicken ("KFC") on Route 16. Mr. Deal agreed and, at the request of the Secret Service, entered KFC while under surveillance. Mr. Deal then received a call from another associate of Mr. X. While in the restaurant Mr. Deal was approached by an associate of Mr. X. Pursuant to the agents' instructions, Mr. Deal indicated to this unknown associate that he would only deal with Mr. X directly. Mr. Deal then made a call to Mr. X, who stated that he was concerned that undercover police were nearby in the parking lot. Mr. Deal, as previously instructed by the agents, acted annoyed and informed Mr. X that he would go across the street to Stop & Shop, which he did. Mr. X then approached Mr. Deal, who made the exchange pursuant to the agents' instructions. As the Secret Service agents moved in, Mr. X became aware of their presence and alerted his associates. Mr. Deal attempted to act as if he were frightened by

---

[4] Since Mr. Deal understands that this individual has not yet been apprehended, Mr. Deal will use a pseudonym herein.

10

the agents' presence, and Mr. X ran. A chase ensued with Mr. X ultimately eluding capture; instead, the agents tackled Mr. Deal and Mr. X got away. (*See Affidavit of Richard Souza, Filed Under Seal in this proceeding on February 5, 2004.*) During this entire time, Mr. Deal did exactly as the agents asked.

Subsequent to his arraignment in this case, Mr. Deal continued to try to assist the Secret Service in pursuit of Mr. X. He looked for him around East Boston, to no avail. He periodically checked in with Secret Service agents to see whether they needed any additional help. Through counsel, Mr. Deal volunteered to testify in the grand jury and provide any other information the government requested. Neither the Secret Service agents nor the Department of Justice ever asked for any additional help.

In sum, not only did Mr. Deal agree to go through with the delivery to Mr. X, Mr. Deal consented to do so while wearing a wire. Mr. Deal also conversed with several of Mr. X's accomplices, during the period of his cooperation, all of whom could have harmed Mr. Deal at any time they sensed their freedom was in jeopardy. If that were not enough, Mr. Deal agreed to meet Mr. X at two different places even though Mr. X was already suspicious that he was being watched by the authorities. Further, Mr. Deal consummated his agreement to assist the Secret Service by actually making the transfer, thus providing the necessary evidence to arrest Mr. X. Unfortunately, Mr. X eluded capture when he observed onlooking Secret Service agents, but Mr. Deal was not to blame for the failed arrest. Even now, Mr. Deal continues to be willing to cooperate despite the fact that Mr. X and his accomplices may still be at large and have some sort of a vendetta against Mr. Deal for his suspected substantial assistance.

11

Mr. Deal promptly and completely cooperated with the government in an effort to help apprehend and prosecute Mr. X. He did so at great personal risk, and his efforts were clearly reliable, in that he led the Secret Service directly to the individual the agents sought. Notably, the government does not challenge the accuracy of the above recitation of Mr. Deal's conduct. (*See* PSR pp. 23-24) Mr. Deal's conduct in this case is exactly the kind of conduct contemplated by U.S.S.G. §5K1.1. A substantial downward departure, of at least 3 levels, is warranted for this conduct.

### 2. Mr. Deal Should Be Granted As Much As A 4-Level Downward Adjustment Pursuant To U.S.S.G. §3B1.2 In Light Of His Mitigating Role In The Charged Offense

U.S.S.G. §3B1.2 provides for a downward adjustment of 2 levels if a defendant is deemed a "minor participant" and as many as 4 levels if the defendant is a "minimal participant." *See* U.S.S.G. § 3B1.2. Mr. Deal submits that a 4-level downward adjustment is appropriate in his case since he was nothing more than a courier who was following the orders of "substantially more culpable participants." *See* U.S.S.G. §3B1.2 cmt. 3; *see generally, United States v. Hurley*, 63 F.3d 1, 20 (1st Cir. 1995) (upholding the trial court's determination that the defendant was a minor participant in an extensive drug-related money laundering organization, where defendant had participated in the conspiracy for a limited amount of time and was responsible for only $3.9 million of the $136 million conspiracy). In determining comparative culpability, a court must assess (i) the defendant's role and knowledge of the criminal conduct charged and (ii) the defendant's conduct relative to that of the other individuals involved in the offense. *See, id.* cmt. n.3(C); *see also, United States v. Isaza-Zapata*, 148 F.3d 236, 242 (3rd Cir. 1998) (stating that the court must make an extensive inquiry into the particular facts to

assess the defendant's relative culpability). *United States v. Downs-Moses*, 329 F.3d 253, 266 n. 14 (1st Cir. 2003), *citing* U.S.S.G. § 3B1.2, comment (n.4) ("A sentencing court will look to the defendant's 'knowledge or understanding of the scope or structure of the enterprise and of the activities of others.'")

A downward adjustment is typically made unless there is evidence of ***active*** and ***essential*** participation in a crime. In fact, there is a substantial body of case law that allows the adjustment for couriers who often are not active participants. *See, e.g., United States v. Burns*, 298 F.3d 523, 546 (6th Cir. 2002) (implicitly stating that a 4-level reduction would be appropriate where the defendant acted *only* as a courier for a small part of a larger operation.) *but cf., United States v. Resurccion*, 978 F.2d 759, 763 (1st Cir. 1992) (defendant attempting to pass counterfeit checks not eligible for a 2-level reduction where there was concrete evidence that defendant "was no mere mule here, but a critical player in a wide-ranging fraud scheme"); *United States v. Frierson*, 2000 WL 1678034, *5 (10th Cir. Nov. 8, 2000) (defendant not entitled to 4-level reduction where he actively participated in counterfeiting scheme and where the defendant was "most knowledgeable" about the plan's details); *United States v. Pebworth*, 112 F.3d 168, 170 (4th Cir. 1997) (4-level reduction was not appropriate where defendant took an active role in the counterfeiting scheme and where defendant made provisions for the counterfeiting enterprise to continue after his incarceration); *United States v. Bolin*, 35 F.3d 306, 310 (7th Cir. 1994) (upholding refusal to grant 4-level downward adjustment where defendant had an integral role in manufacturing and distributing counterfeit bills).

The PSR points to *United States v. Santos*, 357 F.3d 136 (1st Cir. 2004) to support its contention that Mr. Deal is not entitled to a downward adjustment based upon

U.S.S.G. § 3B1.2. In fact, the *Santos* case supports a finding that Mr. Deal is entitled to a downward adjustment in this case. In *Santos*, the defendant asserted that his role was minimal because he was only a courier who lacked an understanding of the scope of the criminal enterprise. In support of this argument, the defendant pointed to his lack of knowledge about the amount of cocaine he was transporting, his absence during the pre-sale negotiations, his method of compensation (flat fee, not a share of the anticipated profits), and his inability to open the vehicle which transported the drugs. *Id.* at 142. Though acknowledging that these facts supported the defendant's argument, the First Circuit ultimately upheld the district court's finding that the defendant was a *minor* rather than a *minimal* participant, relying primarily on the substantial amount of drugs that the defendant-appellant was carrying. Additionally, the court noted that the defendant engaged in active participation when he inspected the quality and assisted with the repackaging of the drugs. Notably, despite the defendant's arguably active role, the court still found that he was entitled to a 2-level reduction.

Unlike the defendant in *Santos* who was given only a 2-level downward adjustment, Mr. Deal did not actively participate in the conspiracy. There is no evidence that he did anything other than follow instructions to pick up and return counterfeit currency to another on two isolated occasions. He was not involved in manufacture or sale of such currency and was clearly less culpable than other participants. Other participants were the ones who set up the network of couriers, and still others, unknown to Mr. Deal, must have actually manufactured the currency. Mr. Deal did not plan the execution of the counterfeiting scheme, did not manufacture the counterfeit Federal Reserve Notes, did not aid in the continuation of the counterfeiting enterprise, or even

14

know their intended purpose. *See, id.* Instead, another individual provided Mr. Deal with "marching orders" and the tools to carry out those orders, including, the specification of dates, contact persons, destinations, transportation, housing and meals. Mr. Deal's obvious lack of planning and knowledge clearly demonstrates that he was a minimal participant rather than a minor participant like *Santos*. *Id.* at cmt. 4 ("a ***minimal participant*** is one who does not have a full understanding of the scope of the conspiracy").

The PSR suggests that, just because Mr. Deal had met two other individuals who gave him orders, he is somehow turned into an "active participant" in the conspiracy. (*See* PSR at 26-28) The PSR points to no case law, however, to support this theory.

Based on the foregoing, Mr. Deal requests that this Court grant him a 4-level downward adjustment based upon his status as a minimal participant. Even if the Court does not deem Mr. Deal eligible for a 4-level departure, Mr. Deal requests, based on the arguments articulated above, that his adjusted offense be reduced by at least 3 or 2 levels.

### 3. Mr. Deal Is Also Eligible For A Downward Departure Under U.S.S.G. §5K2.0 Based On A Combination Of Factors, Which, Standing Alone, Might Not Independently Provide A Basis For A Departure

U.S.S.G. §5K2.0 permits a sentencing court to downwardly depart, "based upon a combination of two or more offender characteristics or other circumstances, none of which independently is sufficient to provide a basis for departure… ." U.S.S.G. §5K2.0. This guideline provides a sentencing court with ample discretion to allow a sentencing judge to depart where it is clear that failing to do so would result in an unjust sentence. Mr. Deal asserts that this is one of those cases.

15

Mr. Deal submits that he is entitled to a downward departure based upon a combination of several factors discussed in Part I.B through I.D, including his limited educational background (U.S.S.G. §5H1.2.); his responsibilities to his immediate family and to his children, one of whom has serious health problems (U.S.S.G. §5H1.6); and his history as a victim of physical and sexual abuse and untreated depression (U.S.S.G. §5H1.3.). *See* PSR, Part C ¶¶ 41-70; *see also United States v. Holz*, 2004 WL 3008753 at *4 (6th Cir. Dec. 21, 2004) (downward departure was warranted where the defendant would have been extraordinarily affected by imprisonment and where others, including his family members and associates, would be adversely affected); *United States v. Spadaro*, 2004 WL 1088773 at *1 (2nd Cir. May 12, 2004) (affirming downward departure based upon 5K2.0 based upon a combination of factors); *United States v. Alba*, 933 F.2d 1117 (2d Cir. 1991) (affirming a downward departure based upon U.S.S.G. §5K2.0). While any one of these factors might not independently provide a basis for departure, they collectively warrant a departure here.

    **C.**    **Consideration Of All Of The Sentencing Factors Set Forth In 18 U.S.C. § 3553(a) Warrants A Sentence Of Probation Rather Than Imprisonment For Mr. Deal**

In *Booker*, the Supreme Court announced that the Sentencing Guidelines are not the sole or necessarily even the best means to determine a defendant's sentence. *See Booker*, 125 S. Ct. at 738. Indeed, even giving "heavy" weight to the guideline range "comes perilously close to the mandatory regime found to be constitutionally infirm in *Booker*." *United States v. Jaber*, 362 F.Supp.2d 365, 371 (D. Mass. 2005) (Gertner, J.). Accordingly, as the PSR acknowledges, "the Court is free to consider any of the information provided by defense counsel and/or the PSR when considering the factors set forth in 18 U.S.C. §3553(a) and . . . the Court is free to vary from the advisory range if it

16

wishes to do so." (PSR at 31-32) As discussed below, a sentence of probation, not imprisonment, is warranted here under all the sentencing factors contained in Section 3553(a).

Under Section 3553(a)(2), a sentence must be "sufficient, **but not greater than necessary,**" in order for the sentence imposed to fulfill the statutory purposes of sentencing set forth in the section. (Emphasis added.) Set forth below, in bold, are each of those statutory "purposes," followed by an explanation of why probation is appropriate here to fulfill each purpose:

    **(A)    To reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense.**

The offense in this case, Mr. Deal's limited role as a courier of counterfeit currency, was an offense against the United States, but it did not involve any victims or any violent conduct. Mr. Deal's overall respect for the law has been evident throughout this proceeding -- in his immediate willingness to cooperate, in his agreement to allow the United States to go forward with an information in lieu of insisting on an indictment in this case, and through his exemplary conduct following the offense. Mr. Deal has shown himself to be a man who does have respect for the law, and for whom probation is thus just punishment.

    **(B)    To afford adequate deterrence to criminal conduct.**

This offense has wreaked havoc on Mr. Deal's personal life. Because of the uncertainty over whether he will face any time in prison and because of restrictions on his travel, he has had difficulty maintaining his family relationships. Although he now has a stable job, he has been unable to pursue some opportunities for advancement because of the uncertain nature of his ultimate punishment in this case. The depression from which

he has suffered periodically throughout his adult life has continued to plague him. The punishment inherent in a federal felony conviction coupled with probation (in addition to the approximately 18 months of pretrial services supervision that Mr. Deal has already completed), is more than enough to achieve the statutory goal of general deterrence.

**(C)    To protect the public from further crimes of the defendant.**

With respect to the goal of protecting the public from further crimes of the defendant, Mr. Deal's post-offense rehabilitation, his extraordinary efforts to assist law enforcement and his strong family support all indicate that a sentence greater than probation is not necessary to protect the public from further crimes of Mr. Deal.

**(D)    To provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.**

Mr. Deal likely should have some form of therapy to assist him in dealing with the results of his traumatic childhood and the depression that he and others have recognized in himself. Imprisoning Mr. Deal would not be the optimal way of achieving this result, however. Rather, the most effective way of providing Mr. Deal the treatment he needs would be to allow him to continue to keep his life on track, as a working and productive member of society, and permit him to pursue therapy outside the prison setting.

* * *

In sum, when the Court considers both Mr. Deal's personal circumstances, and the circumstances surrounding the instant offense, it is clear that a prison sentence would be "greater than necessary" to fulfill the goals of § 3553(a)(2), and thus impermissible.

As explained in the PSR and in Section B of this Memorandum, Mr. Deal committed the offense at a point when he was severely depressed and in dire financial straits, all following the breakup of his marriage. In addition, although the means employed by Mr. Deal were illegal, he committed the offense out of a desire to provide for his family. As underlined by the letters submitted to this Court on his behalf, Mr. Deal's involvement in the charged conspiracy, even though minimal, was completely out of character for Mr. Deal. (*See* Exhibits A-D.) Since Mr. Deal's arrest, he has struggled to get his life back on track, and those who know Mr. Deal best have confidence that he will continue on this path. (*See id; see also* Exhibits E-F.) Mr. Deal's actions in helping the government, his obvious remorse and contrition and his efforts to make a better life for himself and his family make clear that imprisonment here would not be a reasonable punishment for Mr. Deal.

## CONCLUSION

For the foregoing reasons, defendant Patrick Deal respectfully requests that this Court sentence him to a 9-month period of probation based upon an offense level of 10. In the alternative, Mr. Deal requests that the Court sentence him to a 9-month period of probation based upon all of the sentencing factors articulated in 18 U.S.C. § 3553(a).

Respectfully submitted,

PATRICK DEAL,
by his attorneys,


/s/ Diana K. Lloyd
Diana K. Lloyd (BBO# 560586)
Alton A. J. Harmon (BBO# 655832)
CHOATE, HALL & STEWART
Exchange Place
53 State Street
Boston, MA 02109
Telephone: (617) 248-5000

Dated: June 29, 2005